MATTHEW JOHNSON

*v.*

ANNA C. JOHNSON.

*Filed at Ottawa May 9, 1888.*

1.  HUSBAND AND WIFE—SEPARATE MAINTENANCE—*what will justify the wife in living apart from her husband.* To maintain a bill by a wife against her husband for separate maintenance, the former must show, not only that she had good cause for living separate and apart from her husband, but also that such living apart was without fault on her part.

2.  The fault on the wife's part contemplated by the statute, is a voluntary consenting by her to a separation, or such failure of duty or misconduct on her part as materially contributed to a disruption of the marital relation.

3.  If the wife leaves her husband voluntarily or by consent, or if her misconduct has materially induced the action on the part of the husband upon which she relies as justifying the separation, she will not be without fault on her part, within the meaning of the law.

4.  While it is not the policy of the law to encourage a husband and wife in living apart, yet a wife who is not herself in fault, is not bound to live and cohabit with her husband if his conduct is such as to directly endanger her life, person or health, nor when he has pursued a persistent, unjustifiable and wrongful course of conduct toward her, which will necessarily render her life miserable, and living as his wife unendurable.

5.  Mere incompatibility of disposition, occasional ebullitions of passion, trivial difficulties or slight moral obliquities, will not justify the wife in separating from her husband and claiming a separate maintenance.

6.  If the husband voluntarily does that which compels the wife to leave him, or justifies her in so doing, it may be inferred that he intended to produce that result, and the wife's leaving, in such case, would be desertion on his part, and not on the part of the wife.

7.  SAME—*offer on the part of the husband to resume the marital relation.* If the husband, after he has forced his wife to leave him, by harshness and cruelty, offers to take her back, support and give her proper treatment, the offer must be made in good faith, and under such circumstances as will give reasonable assurance of amendment, or it will not bar her of a right to separate maintenance. When the offer to take the wife back is conditioned that on investigation she shall prove not to have been unchaste, and requiring time to investigate that fact, thereby throwing a doubt upon her virtue, she will be justified in refusing such offer and proceeding with her suit. She will not be bound to return and again be mistreated, or at his house live apart from him.

8. SAME—*as to the amount of the allowance.* The allowance to a wife for her separate maintenance is to be determined by the exercise of the judicial discretion of the court, having reference to the wealth of the defendant, the condition in life of the parties, and all the circumstances of the case; and this court will not interfere, except when it is clearly apparent the allowance made is unjust.

9. SAME—*solicitor's fee—of its allowance.* In a suit by a wife against her husband for separate maintenance, the court may, in the exercise of a judicial discretion, allow her reasonable solicitor's fees, which allowance should be made in view of the service rendered or to be rendered, and the ability of the defendant.

10. In such case, the court, *pendente lite,* allowed the wife $150, and on the final hearing $350, and after the husband's appeal to the Appellate Court, the further sum of $225, making in all $725. The proof showed that defendant was worth $50,000, with a fixed annual income of $3000, and that the suit was strongly contested and the record was large: *Held,* that this court could not say the allowance was excessive.

11. SAME—*enforcement of decree—giving a lien upon real estate.* On decreeing a wife a separate maintenance, the court may make its decree a lien on the defendant's real estate, and award execution for the collection of the installments as they become due. The right thus to enforce its decrees is inherent in courts of chancery.

12. In declaring a lien, however, on the husband's land, to secure payment of the money allowed the wife, the court should not unnecessarily incumber the defendant's property. No more of his lands should be tied up by the decree than is reasonably ample security for the payment required by the decree. In the absence of a contrary showing, it will be presumed the trial court did its duty in this respect.

13. CHANCERY — *oral evidence—presumption in support of finding.* Where the evidence in a suit in chancery is conflicting, and the witnesses have been examined orally in open court, the same presumption will be indulged in favor of the finding of the court as in favor of the verdict of a jury.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Mr. HENRY W. MAGEE, for the appellant:

As to alimony *pendente lite,* see *Foss* v. *Foss,* 2 Bradw. 411; *Johnson* v. *Johnson,* 20 id. 495.

As to the grounds that must be shown for separate maintenance, see *Hunter* v. *Hunter,* 7 Bradw. 253; *Houts* v. *Houts,* 17 id. 439; *Ross* v. *Ross,* 69 Ill. 569; *Wahle* v. *Wahle,* 71 id. 511.

The separation must be shown to have been without the wife's fault.   *Umlauf* v. *Umlauf,* 9 Bradw. 517; 117 Ill. 580; *Jenkins* v. *Jenkins,* 104 id. 134.

The husband has the right to select a domicile.   The wife's refusal to go with him absolves him from her support.   *Babbitt* v. *Babbitt,* 69 Ill. 277.

When the wife leaves without sufficient cause, and she refuses to return on the husband's request, she can not have separate maintenance.   *Angelo* v. *Angelo,* 81 Ill. 251.

The courts will not encourage married persons to live apart otherwise than under the authority of a judicial decree.   See 1 Bishop on Marriage and Divorce, secs. 631-795; Schouler on Domestic Relations.

Where a husband is guilty of no cruelty toward his wife, and is willing to provide her a home and all necessaries, then he is not bound to furnish them elsewhere. 1 Bishop on Marriage and Divorce, sec. 573; *Rutherford* v. *Cox,* 11 Mo. 347; *McCutchen* v. *McGohay,* 11 Johns. 282; *Liddlow* v. *Wilmot,* 2 Stark, 87; *Manby* v. *Scott,* 1 Lev. 4; *Bolton* v. *Prentice,* 2 Strange, 1214; *Mason* v. *Mason,* 1 Edw. Ch. 285; *Evans* v. *Evans,* 7 Hagg. Con. R. 57.

If the wife abandons her husband without just cause, (such as fear of personal violence,) the husband is not liable for necessaries furnished her.   *Brown* v. *Patton,* 3 Humph. 135; *Carey* v. *Patton,* 2 Ashm. 140; *Allen* v. *Aldrich,* 9 Foster, 63.

There must be acts or threats which raise a reasonable apprehension of bodily hurt.   (*Harman* v. *Harman,* 16 Ill. 90.) There must be bodily harm.   Harsh and even opprobrious language will not suffice.   *Henderson* v. *Henderson,* 88 Ill. 250.

Cruelty has been considered in the following cases: *Vignos* v. *Vignos,* 15 Ill. 186; *Turbitt* v. *Turbitt,* 21 id. 438; *Carter* v. *Carter,* 52 id. 394; *Embree* v. *Embree,* 63 id. 395; *Ward* v. *Ward,* 103 id. 477.

All the cases agree that there must be just ground for apprehending personal violence before the wife can voluntarily

go away and charge the husband with support. 1 Bishop on Marriage and Divorce, 570; *Blower* v. *Sturtevant,* 4 Denio, 46; *Fredd* v. *Evans,* 4 Harr. (Del.) 385.

If the cruelty under which. the wife suffers comes to her as the natural rebound of her own ill-conduct, she can not have redress in a court of justice, but her remedy is to mend her own manners. 1 Bishop on Marriage and Divorce, sec. 795.

Messrs. HUTCHINSON & PARTRIDGE, for the appellee, after discussing the evidence at considerable length, cited the case of *Sharp* v. *Sharp,* 116 Ill. 509, as a review of all the preceding cases, and as defining what constitutes extreme and repeated cruelty.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

This was a bill, in the usual form, for separate maintenance, by the wife, alleging that she was living separate and apart from her husband, without fault on her part, but was compelled to leave him because of his abuse and cruelty, setting up various specific acts of cruelty, etc. The answer denies all cruelty, and charges that the complainant is violent in temper, and was guilty of great abuse and of personal violence toward the defendant, and denies that she is living separate and apart from him without fault on her part. On final hearing, the court found the complainant entitled to the relief sought, and decreed her $80 per month as permanent alimony, and, in addition to $150 previously allowed as solicitor's fees, the further sum of $350 solicitor's fees, and, after the appeal, $225 for expenses and solicitor's fees in the Appellate Court. Defendant below brought the case to the Appellate Court for the First District, where the decree of the circuit court was affirmed, and he prosecutes this further appeal.

It is urged that the court erred in decreeing relief to complainant, and in the allowance of solicitor's fees. The evidence of the husband and wife is conflicting and wholly irreconcil-

able. They were examined orally before the chancellor. The case depends, to a very considerable extent, if not wholly, upon the credit given to their testimony, although it must be said that the testimony of the wife is corroborated in many important particulars, while the corroboration of the husband is less in degree, and in regard to matters of less vital importance. It is apparent that the chancellor believed appellee, supported by her witnesses, and rendered a decree based upon her evidence thus corroborated.

In cases in chancery, when the evidence is conflicting, and the witnesses have been examined orally in court, it is said, in *Coari* v. *Olsen*, 91 Ill. 277, that there is the same necessity existing as when there has been a trial by jury, that the error in the finding of fact shall be clear and palpable to authorize a reversal. The rule announced is a just one, when the evidence to which credit is given is sufficient to sustain the decree, for the very manifest reason that the chancellor had the witnesses before him, with an opportunity of observing them while testifying, and was thus afforded facilities, frequently of the greatest importance, in determining the weight and credibility of their evidence, which we, from the very nature of the hearing, on appeal, can not have. *Ward* v. *Ward*, 103 Ill. 482; *Flagg* v. *Stowe*, 85 id. 169; *Baker* v. *Rockabrand*, 118 id. 370.

To maintain her bill, it was necessary for the complainant to show, not only that she had good cause for living separate and apart from her husband, but also that such living apart was without fault on her part. At common law, the husband was liable, in an action at law at the suit of any person furnishing to the wife necessaries suitable to her condition in life, if the wife was residing apart from him because of his willful and improper treatment of her, or by his consent. (2 Kent's Com. 146; *Evans* v. *Fisher et al.* 5 Gilm. 571.) No right of action existed in the wife, courts of equity refusing to take cognizance at her suit, and enforce the legal obligation of the husband to maintain her. (2 Story's Eq. Jur. 1422.) The

statute was passed to remedy this defect in the law, and gave the right to the wife to maintain her bill for separate maintenance, but restricted the right to cases where the living separate and apart from the husband was without her fault. The "fault" here meant and contemplated, is a voluntary consenting to the separation, or such failure of duty or misconduct on her part as "materially contributes to a disruption of the marital relation." If she leave the husband voluntarily, or by consent, or if her misconduct has materially induced the course of action on the part of the husband upon which she relies as justifying the separation, it is not without her fault, within the meaning of the law. No encouragement can be given to the living apart of husband and wife. The law and good of society alike forbid it. But a wife who is not herself in fault is not bound to live and cohabit with her husband if his conduct is such as to directly endanger her life, person or health, nor where the husband pursues a persistent, unjustifiable and wrongful course of conduct toward her, which will necessarily and inevitably render her life miserable, and living as his wife unendurable. Incompatibility of disposition, occasional ebullitions of passion, trivial difficulties, or slight moral obliquities, will not justify separation. If the husband voluntarily does that which compels the wife to leave him, or justifies her in so doing, the inference may be justly drawn that he intended to produce that result, on the familiar principle that sane men usually mean to produce those results which naturally and legitimately flow from their actions. And if he so intended, her leaving him would, in the case put, be desertion on his part, and not by the wife.

These parties were married January, 1881, and lived together until August 13, 1885, when appellee left appellant, and shortly after filed this bill. It is apparent that dissimilarity of tastes, arising partially from disparity of their ages, but more from different habits of life, led to frequent difficulty between them, and developed into jealousy on the part of the

husband. Four acts of personal violence are alleged and testified to by appellee, in two of which, including the last, she is corroborated as to the violence to her person, and want of provocation. It will serve no good purpose to describe them in detail. It is unnecessary to say that appellant denies these assaults, and gives an entirely different version of the difficulties, or such of them as he remembers, from that given by appellee and her witnesses.

This, however, is not all of the case made by the evidence for appellee. During the last two years of their living together, it is proved that he was in the habit of drinking, and was frequently under the influence of liquor, and at such times was very abusive,—cursing appellee, using coarse and degrading language, and applying opprobrious names and epithets to her. When she would attempt to caress him he would push her away from him,—at times with such violence that she would strike the furniture. He was often angry, and would clench his fists and gnash his teeth, frequently without saying anything, but at times using abusive language. The evidence shows that she was sick most of the time during the period of gestation, and suffered greatly. She testifies that he was wholly indifferent to her. It is just to say, that appellant denies all mistreatment of his wife, or that he used liquor to excess. That he was indifferent, and used bad language,—that he was under the influence of liquor frequently, and cross and abusive to her,—is shown by other witnesses than appellee. It is shown, also, that he subjected his wife to public indignity at a ball, where they had gone together, by becoming angry at her because she danced another set after he wished to go home, and, throwing down her wraps, which he had procured for her to accompany him, went away, leaving his wife, at or about midnight, to get home without his protection. In the fall of 1883, two years before the separation, he commenced, as he says, keeping a diary, in which he set down the "bad conduct of the appellee." He says the diary contained "notes

of all little troubles there had been between us," and that the
diary was destroyed by his wife, on its discovery by her, be-
cause, as he says, she told him he "had no business keeping
such stuff in a book, like that." When asked by the court if
the memoranda were of troubles between himself and wife, he
replied, "Yes, sir. I used to mark them down. I thought the
troubles were too bad, and now and then I kept a memoran-
dum of them." On cross-examination he says: "It (the diary)
almost contained all her bad conduct, of any account, from
the time I was married to her. I kept the memorandum be-
cause I expected a suit of this kind, for I thought it could not
go very long the way it was going." He was, it would seem,
preparing for the end, which, it may be fairly inferred from his
conduct, he was seeking to bring about. It is true he did not,
as he says, intend to bring a suit. None would be necessary,
on his part, if he succeeded in driving her away. Upon the
discovery of the book by appellee, she destroyed it,—burned
it, she says. She saw but one entry in it pertaining to her,
which was, "My wife, Anna Johnson, pulled my hair," (giving
the date,) which, she says, was utterly untrue. The prepara-
tion and keeping of such a book, going back, and from mem-
ory entering therein "all her bad conduct, of any account,"
from the time of the marriage, shows, that as early as the fall
of 1883, substantially two years before the separation, appel-
lant was contemplating a separation, and preparing for it.
Appellee testifies, that on three different occasions he told her
he wanted to get rid of her; that he did not care for married
life; that he wanted to go back to Colorado; he was happy
there,—the last time being shortly after her baby was born.
August Lagergen testified, that in September or October, 1884,
appellant complained that his wife had a bad temper and ter-
rible tongue, and said "that he should try to get rid of her
some way."

It was, perhaps, not so much in direct charges impugning
appellee's chastity, as in his conduct and declarations imply-

ing his belief in her unfaithfulness to her marriage vows, that his jealousy found expression. Even after this bill was filed, at a meeting arranged by counsel, for some disposition of certain of the articles of household property, appellant expressed a desire for appellee's return, saying, "Anna, I would rather you would not go away; come and live as we were living, or if you want a separate room or rooms, and live apart from me, you can do so." She told him she could not live in a house with a man she loved, and live apart from him, and said to him, "You know I was a pure girl when I married you." He said in reply, "No man can tell whether a woman is pure." On the hearing the chancellor repeatedly tried to bring about a reconciliation between the parties, but each time was thwarted by the willingness of appellant to have appellee return to him, if, upon investigation, he found the appellee a pure woman. Not then, but time must be given to investigate. It might be done in a week, or a month, or three months, but there was that which made it impossible for her to return until investigation was made, and the result proved satisfactory to appellant. Over a year had intervened between the filing of the bill and the hearing. Appellant was possessed of ample means. The widest range was allowed appellant to attack the chastity of appellee,—hearsay statements of her mother and others gone into; yet it is sufficient to say, the record is barren of anything that ought, or in the opinion of any just minded person could, cast a suspicion upon appellee's virtue. This implied belief in her unfaithfulness gave his words a potency to wound they would not otherwise possess, and a force and sting was given, by the state of his mind toward her, to each otherwise trivial circumstance, which might render them intensely cruel.

That appellee was not wholly blameless, at all times, in respect of the troubles with her husband, or as patient under provocation as some women would have been, is, we think, apparent, and may be conceded without materially affecting her

cause. There were occasional sallies of passion and the use of harsh language, which, while it can not be approved, would be no palliation, justification or excuse,—if, indeed, anything could be,—of the personal violence inflicted by the husband upon the wife, or for the persistent course of conduct toward and treatment of her, pursued by appellant, which would inevitably result, as he foresaw it must result, in estrangement and separation. The husband and wife must mutually bear with each other's tempers and dispositions. Mere ebullitions of temper, trivial delinquencies of conduct, and the like, can not be made grounds for disrupting the family, nor a pretext for a course of conduct which necessarily produces that result.

Not only, therefore, can we say that the finding of the trial court is not clearly and palpably shown by the record to have been erroneous, but we think it was warranted in finding that appellee was justified in living apart from her husband, and that she was so living without legal fault on her part.

It is urged, that after the filing of the bill, appellant having requested appellee to return and live with him, she was bound to do so, and therefore the decree is erroneous. We have before adverted to the offer referred to, and need not repeat it. Although appellant may have deserted appellee, or driven her away from him, it is undoubtedly true the *locus penitentiæ* must be kept open for him; but if he offer to return, or to take her back, it must be in good faith, and under circumstances giving reasonable assurance of amendment. On a former occasion, she had, in consequence of his cruelty, left him and gone to her mother's. He went after her, and promised her better treatment, telling his nephew, as the nephew testifies, he ought to be in jail for his conduct. She accepted of his repentance as genuine, and, relying on his promise, returned, but there was no amendment of his conduct. On the occasion referred to by counsel, there was no repentance, no offer to do better, no promise of kindness, no protestation of respect or confidence,— only, as we have seen, an expression of his wish that she return

and live as they had lived, or in separate rooms, if she preferred, and an implied doubt of her purity. She was not bound to return and receive the same treatment at his hands, nor return to his domicile and there live apart from him. It is the actual marriage of the parties,—their living together as husband and wife in lawful wedlock,—that the law favors, and that each has the right to demand. While the wife is living separate and apart from the husband, without fault on her part, he has no right of control as to her place of domicile. That she may fix without his consent, until he shall put her in the wrong, by an offer, in good faith, to restore the marital relation by receiving her back as his wife. But in view of subsequent events, further discussion seems unnecessary. It can hardly be pretended that the offer was in good faith, or if it was, that the subsequent refusal to receive her back without time was given to investigate the question of her chastity, would not still place appellee in the wrong.

The allowance to appellee of $80 per month is said to be excessive, and therefore the decree is erroneous. It was conceded that the defendant was worth $50,000, with a fixed annual income of $3000. The allowance is to be determined by the exercise of the judicial discretion of the court, having reference to the condition of the parties in life, and the circumstances of the case. (Rev. Stat. chap. 68, sec. 22.) We can not say that this has not been done, or that, having reference to the condition in life of the parties and circumstances of the case, the allowance is excessive. We would be justified in interfering for that reason, only when it was clearly apparent to us that an unjust allowance had been made. *Foote* v. *Foote,* 22 Ill. 426.

The court awarded execution to issue in default of payment of the monthly allowance, as in the decree provided, and also made the allowance, etc., a lien on the real estate of the defendant. The right of the court to thus enforce its decrees is inherent in courts of chancery, and we perceive no error in

this regard. It would, however, be the duty of the court, in declaring the lien, not unnecessarily to encumber a defendant's property. He may not, in cases of this sort, discharge the lien at once by the payment of money, and it would be highly inequitable to tie up more of the defendant's land than is reasonably ample security for the payment required by the decree. It is not shown that property in excess of what would be reasonable security is included in the lien, and the presumption in favor of the correct exercise of discretion by the chancellor must prevail. If the decree, as entered, is in this respect unjust, application can be made to the chancellor for a modification thereof, at any time.

It is urged that the allowance of solicitor's fees to be paid appellee's solicitors is excessive and erroneous. The allowances were: *Pendente lite,* $150; on final hearing, $350; after appeal to Appellate Court, for solicitor's fees, etc., in that court, $225; total, $725. The statute provides, (Rev. Stat. chap. 68, sec. 22,) "the court may grant allowance to enable the wife to prosecute her suit, as in cases of divorce." The court may, in the exercise of a judicial discretion, allow reasonable solicitor's fees. Such allowance should be made in view of the services rendered or to be rendered, and the ability of the party against whom the order is made to pay the same. The only objection here made, is, as already stated, that the amount is excessive. In looking into the record, we find it large, and it is evident that the cause has been sternly contested in the several courts through which it has passed. While the orders are subject to review, yet we should not interfere with the exercise of discretion by the trial court, unless it clearly appears that the amount is excessive. (*Foote* v. *Foote, supra: Foss* v. *Foss,* 100 Ill. 576; *Jenkins* v. *Jenkins,* 91 id. 167; *Blake* v. *Blake,* 80 id. 523.) In view of the record, we are not prepared to say there was any abuse of discretion by the chancellor.

The decree will be affirmed.

*Decree affirmed.*