## Felicie M. Modjeski, Appellant, v. Ralph Modjeski, Appellee.

### Gen. No. 22,653.

1. HUSBAND AND WIFE, § 264*—*when evidence sustains bill for separate maintenance.* Evidence *held* sufficient to sustain a bill for separate maintenance, where there was no evidence showing complainant ever voluntarily consented to a separation or deserted defendant or was guilty of conduct justifying divorce or of any fault legally sufficient to defeat her right to separate maintenance, and defendant had absolutely refused to live with her.

2. HUSBAND AND WIFE, § 219*—*when husband has no right to cast off wife.* The law does not permit a husband to cast off a wife because she has disagreed with him as to the manner in which the children shall be educated, or because with his acquiescence and consent she has lived with them in Europe, or because she has written to him letters which, although harsh and unwise, show no desire to destroy, or legitimate tendency to disrupt, the marital relation.

3. HUSBAND AND WIFE, § 217*—*when wife is guilty of such fault as prevents suit for separate maintenance.* A wife may be guilty of

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

such fault as would prevent her from maintaining a suit for separate maintenance, first by conduct on her part which would give the husband just reason for divorce, second, by voluntarily consenting to a separation, or third, by desertion, although the time has not elapsed which would give the husband cause for divorce on that ground.

McDONALD, J., dissenting.

Appeal from the Superior Court of Cook county; the Hon. M. L. McKINLEY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1916. Reversed and remanded with directions. Opinion filed December 21, 1917. Rehearing denied January 2, 1918.

GUERIN & BARRETT, for appellant.

SCOTT, BANCROFT, MARTIN & STEPHENS, for appellee.

MR. JUSTICE MATCHETT delivered the opinion of the court.

This is an appeal by Felicie Modjeski, complainant below, from a decree of the Superior Court of Cook county which dismissed for want of equity her bill for separate maintenance brought against her husband, Ralph Modjeski.

The bill which was filed June 12, 1914, alleged that the complainant had been compelled to and was living separate and apart from the husband without fault on her part. The answer of the defendant admitted that the parties were living separate and apart, but alleged that it was by reason of fault on the part of the wife.

The evidence covers the history of these parties from and even prior to the 28th day of December, 1885, at which time they were married in the State of New York.

The husband and wife were born in Poland. They were related distantly and had known each other from infancy. At the time of their marriage she was 17 and he 23 years of age. Three children were born to them, a daughter now 21 years of age, a son 26 years of age, and a son Charles, or Karolek, 18 years of age.

The defendant at the time of the marriage was a civil engineer earning a salary of $50 per month. He has prospered and now has an income of about $24,-000 per year.

The husband testified he would not any longer live with appellant. He also testified to many matters of which he complained against his wife covering all the years of their married life, most of which were either denied, or explained by her testimony.

We do not think it necessary to weigh this conflicting evidence relating to the things complained of as they were testified to as having taken place prior to December, 1910, when the husband visited his wife, who with two of their children were then in Europe (with his acquiescence and consent), and during that visit lived with her as her husband.

If the defense of the husband is to prevail, some subsequent wrongful conduct on her part must, therefore, be shown. Hence, it becomes important to consider their subsequent conduct.

On his homeward journey from Europe the husband wrote his wife two very kind and affectionate letters and on February 2, 1911, after his arrival wrote:

"5326 East End Ave.,
Feb. 2nd, 1911.

"My Beloved Felus:

Today is your birthday, I was with you in thought and wished you many, many good things. * * * You were very honest and good to me in Paris and the remembrance of those days will always be with me my beloved Felus. I am very lonesome for you. I do not dare to think decisively about the future but I imagine as through a mist a house in Poland which I will visit year after year,—and according to how business will improve, will be making visits longer and longer, so that eventually I will stay there for good. It is a dream—will it come to a realization? God only knows. I only know, that as long as I will have the strength for it, so long will I not do without work. I

must go now—I cuddle you to my heart my dear Tuneczka beloved—hug Marylka.

Yours always,

Tunek."

The first subsequent disagreement arose from the determination of the husband that the youngest son, Charles, or Karolek, who was then attending a school at Ettal in Bavaria, should return to America, and concerning this the husband testifies:

"Charles went to Ettal to school under protest, I left my wife to choose the school from her experience, —I left it to her. In the winter of 1910 and 1911 I visited at Ettal. I approved that school at that time. In the spring of 1911 I insisted that the boy should remain at Ettal for two years and then suddenly in the summer of 1911, I changed my mind and ordered him back to this country."

The wife in many letters protested bitterly; insisted that since the opinion of the parents was divided Karolek should decide between them, and finally telegraphed her husband:

"Letter received. Have written. Karolek has decided to stay until next year."

To which the defendant replied:

"Karolek has nothing to decide. He must be here September 20th; otherwise allowance will cease. Will write by first mail."

She sent the boy but wrote the husband on September 2, 1911, as follows:

"Karolek sails 14th inst. on 'Canadian.'  *  *  * In acting as you did you proved yourself willing and ready for public acquaintance of our standing towards each other, giving me as it were the chance for divorce or separation, both of which you are ready for considering your late actions. I will not give you that chance though you forget the children. You forget that I could claim my due support from you, therefore, your threats of leaving me without funds were baseless. Am I your mistress, that you should have

the right to say: 'Your pension will cease' * * *.''
This letter is signed with her initials only.

The husband testifies that by the beginning of the year 1912 he had consulted a lawyer for the purpose of obtaining a divorce. Keeping that in view, the contents of his letters indicate his purpose to obtain letters from his wife which might be used for that purpose. That he knew he had not succeeded is evident by the appearance in his behalf of his friend Charles Schauffler at Paris in July, 1912, with a request that his wife permit him to secure a secret divorce.

Her evidence (uncontradicted) shows that Schauffler followed her from day to day trying to persuade her in every way to consent. She refused, cabled her husband, and on July 26, 1912, wrote him a letter in which she expressed the shock which his plans for divorce had caused her and urged him to relent. She closed: ''You know I have never broken my word to you, and never will. Having made it under the will of God, I held it sacred, and today upon making the one of 'Never to speak of the past nor anything pertaining to what may be or not be between us, I swear to hold my word sacred and will so respect it, so help me God. Your wife, Felicie.''

By September of that year she had returned to Chicago. He at first refused to meet her, closed the apartment where he had been living, stored the furniture and took rooms at his club. She afterwards saw him, begged him for the sake of the family and of appearances that their relations might be resumed, but he refused, cut her allowance to $150 per month, thus making good Schauffler's threat, and on the 20th day of January, 1914, claiming residence in Oregon, filed a bill for divorce in the Circuit Court of that State in which he charged that his wife had deserted him in June, 1910. When she appeared and answered, appellee dismissed his suit.

It is not easy to collect from the cases a judicial

definition of the words "without fault" as used in the separate maintenance statute. Counsel calls our attention among others to: *Johnson v. Johnson,* 125 Ill. 510; *Finch v. Finch,* 160 Ill. App. 639; *Winterberg v. Winterberg,* 177 Ill. App. 493; *Wahle v. Wahle,* 71 Ill. 510; *Porter v. Porter,* 162 Ill. 398.

From these cases we gather that a wife may be guilty of such fault as would prevent her from maintaining her suit: First, by conduct on her part which would give the husband just reason for divorce; second, by voluntarily consenting to a separation; third, by desertion although the time has not elapsed which would give the husband cause for divorce on that ground.

The rule as stated in *Johnson v. Johnson, supra,* is: "The 'fault' here meant and contemplated is a voluntary consenting to the separation, or such failure of duty or misconduct on her part as 'materially contributes to a disruption of the marital relation.'"

We will not say that the wife in this case was wholly without fault in the sense in which that term is commonly understood. Yet while she may have made mistakes and been unwise in many respects, we search this record in vain for evidence which proves that she voluntarily consented to a separation, or has deserted her husband or was guilty of conduct that would justify a divorce, or guilty of any fault sufficient in the eyes of the law to defeat her right to separate maintenance, and especially when the record discloses an absolute refusal of the husband to live with her. In this connection it may be said that the absence either by letter or conversation of any request from the husband for her return to him from Europe; his employment of a lawyer; his hasty removal from his flat to the club upon knowledge that his wife would arrive in Chicago; the later change of residence to Oregon and the filing of the bill there which was dismissed of his own motion; his cutting her allowance to the sum of

$150 per month, thus making good the threats of Schauffler, are significant facts in this record to which a court may not close its eyes when considering his defense to this bill.

The law does not permit a husband to cast off a wife because she has disagreed with him as to the manner in which the children shall be educated, or because with his acquiescence and consent she has lived with them in Europe, or because she has written to him letters which, although harsh and unwise, show no desire to destroy or legitimate tendency to disrupt the marital relation.

As the decree must be reversed it is not necessary to consider alleged error on refusal of the chancellor to allow appellant further sums for expenses of suit and solicitor's fees. The decree is reversed and the cause remanded with directions to hear the evidence of the appellant upon that subject as well as upon the proper amount of allowance to be made appellant, and for other proceedings in conformity with views herein expressed.

*Reversed and remanded with directions.*

MR. JUSTICE MCDONALD dissents.